# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs May 3, 2016

## IN RE:  JAYVIEN O.

**Direct Appeal from the Chancery Court for Obion County**
**No. 31,701     W. Michael Maloan, Chancellor**

---

**No. W2015-02268-COA-R3-PT – Filed June 7, 2016**

---

This appeal involves the termination of a mother's parental rights.  The trial court found by clear and convincing evidence that the mother abandoned her four-year-old son by willfully failing to visit him and that it was in the best interest of the child to terminate the mother's parental rights.  The mother appeals.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and JOHN W. MCCLARTY, J., joined.

Adam Clayton Billingsley, Union City, Tennessee, for the appellant, Jennifer O.

David L. Hamblen, Union City, Tennessee, for the appellees, Ralph M. and Billie M.

## OPINION

### I.     FACTS & PROCEDURAL HISTORY

Jayvien O.[1] was born in August 2011.  He tested positive for cocaine at birth. Jayvien's mother ("Mother") was 26 years old and unmarried.  She had resided "off and on" with her former foster mother ("Mrs. M") for the past ten to eleven years but was not residing with Mrs. M when Jayvien was born.  Mother called Mrs. M and asked if she and Jayvien and Mother's seven-year-old daughter could live with her "for a little while."

---

[1]In cases involving a minor child, it is this Court's policy to redact names in order to protect the child's identity. In this case, in order to preserve both clarity and the anonymity of the child, we will redact the names of individuals sharing the child's surname and will refer to those individuals by their given name and the first letter of their surname.

Mrs. M agreed. Shortly thereafter, the Tennessee Department of Children's Services ("DCS") also contacted Mrs. M and asked if she was willing to "take this child in" due to his cocaine exposure. Again, Mrs. M agreed. She and her husband took Jayvien home from the hospital when he was three days old. He has lived with Mrs. M and her husband ("Mr. M") continuously since that date.

Mr. and Mrs. M resided in Union City, Tennessee, and Mother resided in Dresden, Tennessee. After Jayvien's birth, Mother continued to reside in Dresden, and Jayvien lived with Mr. and Mrs. M. They maintained an "open door" policy for Mother and allowed her to see Jayvien anytime she wanted and was able to do so. However, during the first six months of Jayvien's life, Mother spent very little time with him. Guardianship proceedings were instituted in the juvenile court of Weakley County, and Mother requested that the court enter a specific visitation schedule for her. Mother and her appointed counsel attended a hearing on May 1, 2012, regarding guardianship and a visitation schedule. On July 10, 2012, the juvenile court entered an order granting permanent guardianship of ten-month-old Jayvien to Mr. and Mrs. M by agreement of the parties. The order provided that Mother would have visitation with Jayvien the first weekend of every month from Friday at 5:00 p.m. to Sunday at 9:00 a.m., with overnight visitation at the discretion of Mr. and Mrs. M. Mother was also permitted to visit Jayvien the third Saturday of each month at the home of Mr. and Mrs. M. Mother was permitted to have additional visitation with Jayvien by agreement with Mr. and Mrs. M. The order also addressed Mother's eight-year-old daughter ("Daughter"), Jayvien's half-sister. By previous order, the juvenile court had awarded custody of Daughter to her father. The juvenile court ordered that Daughter would have visitation with Mother at the residence of Mr. and Mrs. M during the visitation with Jayvien that was scheduled for the first weekend of each month.

During the next year and a half, Mother visited with her two children regularly at the home of Mr. and Mrs. M. Daughter's father gratuitously allowed her to visit on the third weekend of each month in addition to the first weekend that was specified in the order. Mother generally visited with both children on the first and third Saturday of each month from approximately 10 a.m. to 3 p.m. However, she never exercised visitation on a Friday or Sunday, and she never asked to have overnight visitation.[2]

Around June or July 2014, Daughter's father and step-mother stopped allowing Daughter to visit on the third Saturday of each month. Around this same time, Mother made the decision to stop visiting on the third Saturday as well. From that point forward, Mother generally only visited the home of Mr. and Mrs. M on the first Saturday of each

---

[2]Mother spent one night in the home of Mr. and Mrs. M after Jayvien was born, around Christmas 2011, prior to the entry of the order on visitation.

month, when both children were present, from about 10 a.m. to 3 p.m. After this schedule continued for approximately nine months, Mr. and Mrs. M filed a petition to terminate Mother's parental rights and to adopt Jayvien on March 11, 2015. The petition alleged that Mother had abandoned Jayvien by willfully failing to visit or to engage in more than token visitation with him for a period of at least four months preceding the filing of the petition. They also alleged that it was in the best interest of Jayvien, who was three-and-a-half by that time, for Mother's parental rights to be terminated.[3]

The matter was tried on September 29, 2015. Mother admitted that Jayvien was born with cocaine in his system due to her use of cocaine. She testified that DCS got involved and placed the child with Mr. and Mrs. M in August 2011, when he was three days old. Mother testified that DCS developed a permanency plan but eventually closed its case. Mother completed a ten-week parenting class in November 2011. She subsequently moved into public housing but was forced to leave due to police discovering marijuana and an Adderall pill inside her residence. Mother was charged with simple possession and placed on probation, and she remained on probation at the time of trial due to her claimed inability to pay her court costs, fines, and fees with child support being deducted from her paycheck. After Mother left public housing, she moved into the home of an elderly man whose house she cleaned, and she resided there for two years. Three months prior to trial, Mother moved into a residence with her biological mother. Mother gave birth to her third child three weeks prior to trial. She testified that she was drug-free at the time of trial and had not used drugs in "a long time."

Mother referred to Mrs. M as "Mom" and testified that she and Mrs. M love each other. Mother conceded that after Jayvien's birth, she was allowed to visit Mrs. M's home and see Jayvien whenever she wanted. She acknowledged that she began visiting on the first and third Saturdays of each month from 10 a.m. to 3 p.m. after the visitation schedule was entered following the May 1, 2012 hearing. However, Mother testified that she never knew that she was entitled to any additional visitation beyond those hours on the first and third Saturdays. She claimed that she was unaware that she could have visited on Fridays or Sundays. Mother claimed that her previous attorney never explained the visitation schedule to her. Mother admitted that the trial judge and the attorneys discussed the visitation schedule during open court at the May 2012 hearing, but Mother testified that she did not recall any discussion of Friday or Sunday visitation. Mother confirmed that the address shown on the order's certificate of service was the address where she resided at the time, but she claimed that she never received a copy of the order. In sum, according to Mother, she believed that she was limited to a schedule of 10 a.m. to 3 p.m. on the first and third Saturday of the month. Mother testified that she

---

[3]The petition also sought termination of the parental rights of Jayvien's father on the basis that he had never visited the child. Jayvien's father ultimately consented to the termination of his parental rights, and that decision is not at issue on appeal.

did not learn about the more expansive terms of the order until the termination proceedings arose and she discussed the order with her newly appointed attorney.

Despite Mother's admitted knowledge of the first and third Saturday visitation, she conceded that she stopped visiting on the third Saturday of each month around the spring or summer of 2014. Mother claimed that this was due to her vehicle being wrecked in April 2014 rather than a deliberate response to Daughter's absence. She testified that visiting was difficult due to her lack of a vehicle, lack of money for gas, and her employment at a local fast food restaurant where she had worked for one year. Mother testified that her employer did not schedule her to work on the first Saturday of the month so that she could attend those visits, but she worked most other Saturdays and was off work on two weekdays. Mother later estimated that she worked on the third Saturday of the month about three-quarters of the time. Mother was asked what happened when Daughter stopped attending the visits and explained:

> [Daughter] quit coming and I had a job and I didn't have a vehicle. And if I didn't beg, borrow and plead to find a vehicle, then I just didn't have a way. So I chose the first weekend to see both of my kids as opposed to the third weekend just to see one of them.

Mother said, "I chose to go to the first visit and I made sure I had a way there every time." Mother testified that her mother or sister drove her to work and to visits with Jayvien, and the majority of the time, she obtained gas money from the elderly man with whom she lived. Mother testified that child support was being deducted from her paycheck and that she was not current on her payments. Mother said that she eventually stopped contacting Mrs. M to tell her that she would not be visiting on the third Saturday of each month because "it was understood" that she had made the decision not to visit on those dates.

Mother admitted that during her first Saturday visits, most of her time was spent with Daughter. She explained that Jayvien "is his own child" and she "let him do his own thing," so he often went outside to play. Because Mother was pregnant during the past nine months, she testified that she was unable to spend much time outside playing with Jayvien. Mother estimated that she would spend time outside with him during ten to fifteen minute stretches during the visit. She also admitted that when Jayvien was inside, he spent "three-fourths of the time . . . watching stuff on [a] phone and could care less about anything else." Overall, Mother estimated that during a typical five-hour visit, she would spend "maybe three [hours] with [Daughter] and two with Jayvien, all together." However, she clarified that when Jayvien was outside and she was "not right there physically doing something with [him]" but was watching him, she considered that "spending time with him."

4

Mother was asked if she ever requested overnight visitation with Jayvien, and she responded,

A. No, I didn't. I think, really, after my mom and [Mr. M] allowed my child to call them Mom and Dad, I kind of shut myself down from this situation.

Q. What do you mean when you say, "I shut myself down"?

A. Because it hurt me.

Q. What did you do to shut yourself down?

A. I didn't involve myself in as much as I should have, I didn't. But I was hurt. And, yes, I did hurt my child in the process. But I love my child and I want to be with my child more than I am now.

Mother was asked whether she had developed any relationship with Jayvien and she responded that she had a "limited relationship" with him. She acknowledged that her limited relationship with Jayvien was mostly her fault and conceded that she was not as involved with Jayvien as she should be. She said, "I want to know my son. I want him to know me as his momma, not [Mrs. M]."

Mrs. M also testified. She considered Mother to be her daughter. She testified that Mother had resided with her intermittently since the age of 15, alternating between her home, Mother's mother's home, and various other residences. Mrs. M testified that she was contacted by Mother and by DCS after Jayvien's birth in August 2011. She was informed of his cocaine exposure and agreed to "take the child in." Mrs. M explained that she maintained an open door policy for Mother to visit Jayvien after he was born, but Mother only spent about 26 hours with him during the first six months of his life. Mother stayed overnight at her home only once, around Christmas 2011 when Jayvien was four months old, and never asked to do so again. Mrs. M testified that it was Mother who requested "a set visitation" schedule, and the schedule was discussed in court at the May 1, 2012 hearing, but Mother never visited on a Friday or Sunday. Mrs. M testified that DCS scheduled the *third* Saturday visitation from 10 a.m. to 3 p.m., but according to Mrs. M, the *first* Saturday visitation could have been from sunup to sundown. Still, Mother visited from only 10 a.m. to 3 p.m. Mrs. M said that Mother's first Saturday visitation was "very regular" and that she only missed a few visits on the first Saturdays. She said that Mother also visited regularly on the third Saturday until Daughter stopped coming, and then Mother stopped coming as well. Mrs. M produced a calendar showing all of Mother's visits at her home. Mrs. M testified that during the year and a half when Daughter visited on the third Saturday, Mother missed only three visits on a third Saturday, but after Daughter stopped visiting on the third Saturday, in 2014, Mother missed thirteen third Saturday visits. Mrs. M believed that Mother came on the third Saturdays as long as Daughter was there and then stopped when she would only see

5

Jayvien. Mrs. M testified that by the time of trial, Mother had not visited on a third Saturday in about a year and a half.

During the four months preceding the filing of the termination petition in March 2015, Mother visited Mrs. M's home on December 27, January 3, February 7, and March 7, with each visit lasting from about 10 a.m. to 3 p.m. Daughter was there for each of these visits. Mrs. M testified that Mother spent "the whole time" with Daughter, who was ten years old by that time, doing her hair and nails and taking pictures together. Mrs. M acknowledged that Mother was involved with Jayvien when he was a baby, but she explained that things had changed since he had become an energetic four-year-old. She testified that Mother tries to hug Jayvien when she arrives for visits, but Jayvien will not hug her and pulls away. Mrs. M testified that Jayvien always "goes and does his own thing" in his play room or outside, and Mother does not play with him in either of those places. She described Mother's involvement with Jayvien as "very, very minimal." Mrs. M estimated that during Mother's five-hour visits at her home, she devoted about 30 minutes solely to Jayvien. Mrs. M testified that she had never seen Mother sit in the floor to play cars with Jayvien, and Mother had never attempted to help him learn colors or read. Mrs. M was asked what she *had* observed Mother doing with Jayvien, and she responded, "I don't have a memory of anything." Mrs. M said she knew that Mother loved Jayvien but that she did not show it during visits because she spent her time with Daughter. Mrs. M testified that she also informed Mother that Jayvien was playing t-ball during the summer on Tuesday and Thursday nights, but Mother did not ask for any details and never attended a game. Mrs. M testified that Mother "very rarely" contacts her by text message or phone call to ask about Jayvien, and Mother does not call to talk to Jayvien on the phone.

When asked about her own relationship with Jayvien, Mrs. M testified that he is "my heart" and that she loves him. She added that she and her husband had raised Jayvien. She described Jayvien as very smart and intelligent and said he was doing well in a local headstart program.

Mr. M similarly testified that Mother devoted her time during visits to Daughter, doing her hair and makeup and taking pictures. While Mother is interacting with Daughter, he said, Jayvien is generally playing in his room, jumping on the trampoline outside, or riding a four wheeler. Mr. M testified that either he or his wife stays outside with Jayvien in order to supervise him. Mr. M could not recall a time when Mother had left Daughter inside to go outside to be with Jayvien. He also did not recall a time when she played games with Jayvien, read to him, or colored with him.

The trial court entered an order terminating Mother's parental rights on November 2, 2015. The trial court made the following findings regarding Mother's visitation with Jayvien:

> The Court finds that the mother's visitation with the minor child during the first six (6) months of the child's life totaled twenty-six (26) hours. The Court finds that the mother never visited the child on Friday or Sunday of the first weekend and would only visit on Saturday for a few hours. The testimony from [Mrs. M] was clear that most of the mother's attention was on her daughter [] and that the time spent with the minor child, Jayvien, was very minimal and maybe thirty (30) minutes out of the whole visit. The mother testified she did not go outside and play with Jayvien because it was so hot and she was pregnant and she had to stay inside. The mother readily admitted she did not involve herself as much with Jayvien as she should and was upset because Jayvien calls [Mr. and Mrs. M] "Mom and Dad". The mother further testified that she never requested overnight visitation with Jayvien and stated she was not aware of the Friday or Sunday visitation schedule. The Court finds that she knew of the third Saturday visitation and chose not to come after [Daughter's] visitation stopped. The Court further finds [] from the testimony of [Mr. M] . . . that mother was occupied with [Daughter], brushing her hair, applying makeup and taking pictures.

The trial court recognized that Mother did not have a car and depended on others for transportation. However, the court also found that Mother's visitation did not diminish until Daughter's father refused to allow her to visit on the third Saturday. The trial court found that Mother missed thirteen third Saturday visits with Jayvien after Daughter stopped visiting. In conclusion, the court found by clear and convincing evidence that Mother's visitation with Jayvien "was no more than token visitation," and therefore, "she ha[d] willfully abandoned the minor child within the meaning of the statute."

The trial court also found by clear and convincing evidence that it was in Jayvien's best interest to terminate Mother's parental rights. The trial court granted the petition for adoption filed by Mr. and Mrs. M. Mother timely filed a notice of appeal.

## II. ISSUES PRESENTED

Mother presents the following issue for review on appeal:

1. Did the chancery court err in finding that Mother abandoned Jayvien when she had visited and provided support in the four months prior to the

filing of the petition for adoption?

Although Mother did not frame her issue to challenge the trial court's best interest determination, we must address that issue as well. *See In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016) ("[I]n an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.").

After carefully reviewing the record, we affirm the decision of the chancery court and remand for further proceedings.

## III. STANDARD OF REVIEW

In Tennessee, proceedings to terminate a parent's parental rights are governed by statute. *In re Kaliyah S.*, 455 S.W.3d 533, 541 (Tenn. 2015). Tennessee Code Annotated section 36-1-113 sets forth the grounds and procedures for terminating the parental rights of a biological parent. *Id.* at 546. Pursuant to the statute, parties who have standing to seek termination of a biological parent's parental rights must prove two elements. *Id.* at 552. First, they must prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated section 36-1-113(g). *Id.* Second, the petitioner must prove that terminating parental rights is in the child's best interest, considering, among other things, the factors listed in Tennessee Code Annotated section 36-1-113(i). *Id.* In light of the constitutional dimension of the rights at stake in a termination proceeding, the persons seeking to terminate parental rights must prove both of these elements by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). "Clear and convincing evidence" has been defined as "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) (citing *In re Valentine*, 79 S.W.3d at 546). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

In sum, in order to terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination, but also that termination is in the child's best interest. *In re Adoption of Angela E.*, 402 S.W.3d at 639. Because of this heightened burden of proof in parental termination cases, on appeal we must adapt our customary standard of review as set forth

in Tennessee Rule of Appellate Procedure 13(d). *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). First, we review each of the trial court's specific factual findings *de novo* in accordance with Rule 13(d), presuming the finding to be correct unless the evidence preponderates against it. *In re Adoption of Angela E.*, 402 S.W.3d at 639. Second, we must make our own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV. DISCUSSION

### A. Grounds for Termination – Abandonment

The first ground for termination listed in the termination statute is abandonment. Tenn. Code Ann. § 36-1-113(g)(1). For purposes of terminating parental rights, there are five alternative definitions of abandonment. *See* Tenn. Code Ann. § 36-1-102(1)(A)(i)-(v). Pursuant to the first definition, which is relevant here, "abandonment" occurs when a parent has "willfully failed to visit" for a period of four consecutive months immediately preceding the filing of a proceeding to terminate parental rights.[4] Tenn. Code Ann. § 36-1-102(1)(A)(i). The statute further defines "willfully failed to visit" as "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). For purposes of the statute, "'token visitation' means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child.'" Tenn. Code Ann. § 36-1-102(1)(C).

The trial court found that Mother engaged in "no more than token visitation" and "willfully abandoned the minor child within the meaning of the statute." The trial court found that Mother only visited with Jayvien 26 hours during the first six months of his life, when Mother had an "open door" policy for visitation.[5] The court found that after

---

[4]We note Mother's argument on appeal regarding her ability to *support* Jayvien during the four-month period before the termination petition was filed. However, the trial court did not terminate Mother's parental rights based on willful failure to support, so we have not analyzed the issue in this opinion.
[5]The statutory definition of abandonment requires the court to focus on the parent's conduct during the pivotal four-month period prior to the termination petition, but "the parent's conduct and the relationship between the child and the parent up to this point is relevant background and context for the necessarily

the specific visitation schedule was entered at Mother's request, she "would only visit on Saturday for a few hours" once a month, and during that time, "the time spent with the minor child, Jayvien, was very minimal and maybe thirty (30) minutes out of the whole visit." The court found that Mother "chose not to come" on the third Saturday of each month after Daughter's visitation stopped, never visited on a Friday or Sunday, and never requested overnight visitation. The court noted Mother's admission that she did not involve herself as much with Jayvien as she should have because she was upset that Jayvien calls Mr. and Mrs. M "Mom and Dad."

The evidence supports the trial court's factual findings. During the four months preceding the filing of the termination petition on March 11, 2015, Mother visited Mrs. M's home only four times – on December 27, January 3, February 7, and March 7 -- with each visit lasting from about 10 a.m. to 3 p.m.[6] Mother spent the great majority of her time during these visits, by her own admission, with Daughter instead of Jayvien. Mother and Jayvien had no contact by telephone between these visits.

Determining whether Mother's visitation amounted only to token visitation "requires that we examine the frequency, duration, and quality of the visits that occurred." *In re Keri C.*, 384 S.W.3d 731, 750 (Tenn. Ct. App. 2010). To determine whether visitation was sufficient, "the court should consider quality as well as quantity." *In re L.J.*, No. E2014-02042-COA-R3-PT, 2015 WL 5121111, at *4 (Tenn. Ct. App. Aug. 31, 2015) (*no perm. app. filed*). The concept of visitation requires "'much more than a mere physical presence.'" *Id.* (quoting *State Dep't of Children's Servs. v. L.L.T.*, No. E2003-00501-COA-R3-JV, 2003 WL 23094559, at *4 (Tenn. Ct. App. Dec. 30, 2003)). Pursuant to the relevant statutes, we must consider whether the visits were "perfunctory" or "of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C). "Perfunctory" means "characterized by routine or superficiality: done merely as a duty" or "lacking in interest or enthusiasm: apathetic, indifferent." *In re Keri C.*, 384 S.W.3d at 750 n.9 (citing *Webster's Third New International Dictionary* 1678 (1993) (unabridged)); *see, e.g.*, *State Dep't of Children's Servs. v. L.L.T.*, 2003 WL 23094559, at *4 (describing a mother's presence at visits as "perfunctory" when she spent her time applying makeup, sleeping, and arguing with the father, rather than properly focusing her

---

fact-intensive evaluation of whether the visitation *during* the four-month period was merely 'token.'" *In re Keri C.*, 384 S.W.3d 731, 749 (Tenn. Ct. App. 2010). "[T]he significance of facts such as the setting and the length of time of the visits during the relevant time period is better assessed with an understanding of the parent's prior efforts to forge a relationship with the child, and whether a bond between parent and child had previously been established." *Id.*

[6]Daughter was sick on the first Saturday in December and did not attend the visit. Mother did not attend the visit either.

attention on and caring for the child).

Here, the trial court found that Mother "was occupied with [Daughter], brushing her hair, applying makeup and taking pictures" during the visits, and the evidence supports this finding. Mother admitted that she spent the majority of her time during the visits with Daughter instead of Jayvien, who was usually in another room, outside, or playing on a phone. Mother also candidly admitted that the time she had spent with Jayvien thus far in his life resulted in only a "limited relationship" being established between them. She acknowledged that Jayvien knows Mrs. M as his mother. Jayvien had lived with Mr. and Mrs. M since birth, so his relationship with Mother has been formed entirely during her visits. Seeing Jayvien once a month, while devoting her attention to Jayvien's half-sister, was simply insufficient for Mother to establish any more than minimal contact with him.

Considering the quality and quantity of Mother's visits, we are left with a definite and firm conviction that Mother's visits were so infrequent and of such short duration that they represent minimal or insubstantial contact with the child and constitute token visitation. We recognize that Tennessee Code Annotated section 36-1-102(1)(C) requires us to consider "the circumstances of the individual case" to determine whether Mother's visitation amounted to token visitation. *See also In re Candace J.*, No. M2015-01406-COA-R3-PT, 2016 WL 944268, at *7 (Tenn. Ct. App. Mar. 11, 2016) (*no perm. app. filed*) (citing *In re Ciara D.*, No. M2014-01229-COA-R3-PT, 2014 WL 6680696, at *6-7 (Tenn. Ct. App. Nov. 25, 2014)). Whether visitation should be characterized as token is a fact-intensive inquiry to be decided on a case-by-case basis. *In re Keri C.*, 384 S.W.3d at 748. However, we also note that our conclusion regarding Mother's visitation is consistent with other cases involving token visitation. *See, e.g., In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *12 (Tenn. Ct. App. Apr. 20, 2016) (four visits in a four month period constituted token visitation); *In re L.J.*, 2015 WL 5121111, at *4 (attending three of eight offered visitations was token visitation); *In re E.L.R.*, No. E2014-00394-COA-R3-PT, 2014 WL 6735394, at *7 (Tenn. Ct. App. Dec. 1, 2014), *perm. app. denied* (Tenn. Feb. 25, 2015) (seeing the child five times in the four month period was token visitation); *In re Joseph G.*, No. E2012-2501-COA-R3-PT, 2013 WL 3964167, at *9 (Tenn. Ct. App. July 31, 2013) (weekly visits for only two of the four months constituted token visitation); *In re Hope A.A.*, No. E2012-01209-COA-R3-PT, 2013 WL 1933026, at *11 (Tenn. Ct. App. May 10, 2013) (five visits for a total of ten hours was insufficient); *In re Keri C.*, 384 S.W.3d at 750 (four or five visits amounted to token visitation).[7]

---

[7]As the court did in *Keri C.*, we also "caution against a mechanistic application of our holding in future cases," recognizing that "under different facts, once-a-month contacts between parent and child may be

11

On appeal, Mother argues that a finding of abandonment requires proof that the parent "evince[d] a settled purpose to forego all parental duties and relinquish all parental claims to the child," citing a case from 1961. However, this is not a correct statement of existing law. Tennessee Code Annotated section 36-1-102(1)(G) expressly provides: "it shall not be required that a parent be shown to have evinced a settled purpose to forego all parental rights and responsibilities in order for a determination of abandonment to be made." *See In Re Jayden B.T.*, No. E2014-00715-COA-R3-PT, 2015 WL 3876573, at *5 (Tenn. Ct. App. June 23, 2015), *perm. app. denied* (Tenn. Sept. 25, 2015). "Abandonment" does not have any other definition except that which is set forth in the statute, as the legislature intended to establish the only grounds for abandonment by statutory definition. Tenn. Code Ann. § 36-1-102(1)(G). Decisions to the contrary were legislatively overruled. *Id.*

Mother also claims that her failure to visit was not willful. She claims that she visited consistently until her vehicle died. However, the record reflects that Mother abruptly stopped visiting not in April 2014, when she testified that she wrecked her car, but in July 2014 when Daughter stopped visiting. The trial court specifically found that Mother's "visitation diminished when [Daughter's] father refused to allow her to visit," and it concluded that Mother "chose not to come after [Daughter's] visitation stopped." The trial court apparently did not believe Mother's testimony that she only failed to visit due to her work schedule and transportation issues. This is a reasonable conclusion based on Mother's pattern of consistent visitation and its abrupt cessation that coincided with Daughter's absence. Mother admitted that she stopped notifying Mrs. M that she would not attend visits on the third Saturday because "it was understood" that she had already made the decision not to attend. As Mother put it, she "shut [her]self down from this situation" and "didn't involve [her]self in as much as [she] should have."

The element of willfulness is essential and central to the determination of abandonment. *In re M.L.D.*, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005); *In re C.M.C.*, No. E2005-00328-COA-R3-PT, 2005 WL 1827855, at *6 (Tenn. Ct. App. Aug. 3, 2005). It is both a statutory and a constitutional requirement. *In re Adoption of Kleshinski*, No.

reasonable visitation, not token." 384 S.W.3d 731, 753 n.10. The number of visits, standing alone, is not determinative. *See In re E.M.P.*, No. E2006-00446-COA-R3-PT, 2006 WL 2191250, at *5 (Tenn. Ct. App. Aug. 3, 2006) (explaining that the fact that only one visit occurred in a four-month period "certainly is relevant" to a finding of token visitation but "standing by itself is not conclusive"). C*ompare In re E.L.R.*, No. E2014-00394-COA-R3-PT, 2014 WL 6735394, at *7 (Tenn. Ct. App. Dec. 1, 2014) (seeing the child five times in the four month period was token visitation when the mother went to the custodian's home not necessarily to see the child or spend quality time with him but for the mother's own needs and purposes); *with In re Caira D.*, No. M2014-01229-COA-R3-PT, 2014 WL 6680696, at *7 (Tenn. Ct. App. Nov. 25, 2014) (regular telephone contact was sufficient visitation, even without an in-person visit, where the father lived seven hours away and lacked a driver's license or financial means).

M2004-00986-COA-R3-CV, 2005 WL 1046796, at *18 (Tenn. Ct. App. May 4, 2005). But willfulness in the context of termination proceedings does not require the same standard of culpability as is required by the penal code, nor does it require that the parent acted with malice or ill will. *In re Audrey S.*, 182 S.W.3d at 863; *see also In re S.M.*, 149 S.W.3d 632, 642 (Tenn. Ct. App. 2004). Rather, a parent's conduct must have been willful in the sense that it consisted of intentional or voluntary conduct rather than accidental or inadvertent acts. *In re Audrey S.*, 182 S.W.3d at 863. The petitioner must establish by clear and convincing evidence that the parent who failed to visit had the capacity to do so, did not attempt to do so, and had no justifiable excuse for not doing so. *In re Adoption of Angela E.*, 402 S.W.3d at 640. Triers-of-fact lack the ability to peer into a parent's mind to assess intentions or motivations and must infer intent from circumstantial evidence, including the parent's actions or conduct. *In re Audrey S.*, 182 S.W.3d at 864. A parent's subjective intent and interest in the child is relevant to the issue of token visitation, but "the termination statutes generally require that such interest manifest in the form of objectively reasonable action geared toward establishing a healthy parental relationship." *In re Keri C.*, 384 S.W.3d at 751. A "parent's 'demeanor and credibility as a witness also play an important role in determining intent, and trial courts are accordingly in the best position to make such determinations.'" *In re Jayden B.T.*, 2015 WL 3876573, at *5 (quoting *In re Adoption of Destiny R.D.*, No. M2011-01153-COA-R3-PT, 2012 WL 1066496 at *7 (Tenn. Ct. App. Mar. 27, 2012)).

Mother's efforts to visit Jayvien during the four-month period "cannot be viewed as a reasonable attempt to forge a meaningful relationship with the child." *In re Keri C.*, 384 S.W.3d at 750-51. Having carefully reviewed the record and Mother's arguments on appeal, we affirm the trial court's finding by clear and convincing evidence that Mother's visitation with Jayvien "was no more than token visitation," and that she "willfully abandoned the minor child within the meaning of the statute."

## B.   Best Interest

Tennessee Code Annotated section 36-1-113(i) provides a list of factors that are relevant when deciding what is in a child's best interest. However, the list is not exhaustive. The best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). "[W]hen the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child." *In re Jacobe M.J.*, 434 S.W.3d 565, 573 (Tenn. Ct. App. 2013) (citing Tenn. Code Ann. § 36-1-101(d)). "Facts relevant to a child's best interests need only be established by a preponderance of the evidence, although [the petitioner] must establish that the combined weight of the proven facts

13

amounts to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 535 (citing *In re Kaliyah*, 455 S.W.3d at 555).

The trial court found that: Mother abused and neglected Jayvien by using cocaine while pregnant resulting in Jayvien being cocaine dependent at birth; she had not maintained regular visitation or other contact with Jayvien; she had not made such an adjustment of circumstances, conduct, or conditions as to make it safe and in Jayvien's best interest to be in her home; a change of caregivers and physical environment would likely be detrimental to Jayvien; she had not paid child support consistent with the child support guidelines; and "most importantly," according to the court, a meaningful relationship had not been established between Mother and Jayvien. We conclude that the evidence in the record does not preponderate against the trial court's factual findings and further conclude that the combined weight of these facts amounts to clear and convincing evidence that termination of Mother's parental rights is in Jayvien's best interest.

Mother complains that the record contains no evidence that DCS made any efforts to reunify her with Jayvien. The information in the record regarding DCS's involvement with Mother is very sparse. Mother testified that she had been involved with DCS regarding *Daughter* and that DCS removed Daughter from her custody and placed her with her father. She mentioned allegations that Daughter was abused, insufficiently clothed, and did not have enough food. Aside from this incident with Daughter, Mother testified that DCS "had been called" on other occasions, "but they had never been involved." At one point, Mother made reference to a permanency plan, but Mother also testified that DCS "closed the case out." According to the order from juvenile court, Mother attended the hearing regarding guardianship and was "in agreement for permanent guardianship of Jayvien [] to be awarded to [Mr. and Mrs. M]." The record does not indicate that Jayvien ever entered DCS custody.

"In cases in which DCS removes a child from the home," Tennessee Code Annotated section 37-1-166, which is part of Tennessee's juvenile statutes addressing foster care and dependency and neglect proceedings, "generally directs DCS to make reasonable efforts to reunify the parent with the child unless DCS can show that it is not required to do so." *In re Kaliyah S.*, 455 S.W.3d at 554. However, "nothing in the plain language of [the termination statute,] Section 36-1-113[,] indicates that a petitioner in a proceeding to terminate parental rights is in fact required to put on proof of DCS's reasonable efforts to assist the respondent parent." *Id.* Instead, "the trial court is to consider DCS's reasonable efforts, or the lack thereof, in determining whether termination of the parent's rights is in the child's best interest." *Id.*

14

"[I]n cases in which the subject child was never taken into DCS custody and a private party filed a petition to terminate the parental rights of a biological parent, the private-party petitioner has not been required to prove reasonable efforts to reunify" as part of its case. *In re Kaliyah S.*, 455 S.W.3d at 551 (citations omitted). The same holds true for "cases in which the subject child was at some point taken into DCS custody--the private-party petitioner was nevertheless not required to establish reasonable efforts as part of his case." *Id.* (citations omitted).

Mother consented to the order granting permanent guardianship of Jayvien to Mr. and Mrs. M. As private party petitioners, Mr. and Mrs. M were not required to demonstrate that DCS made reasonable efforts to reunify Mother with Jayvien, who was not in DCS custody. *See, e.g.*, *In re Joseph F.*, No. E2015-00733-COA-R3-PT, 2016 WL 1276652, at *14 (Tenn. Ct. App. Mar. 31, 2016), *perm. app. denied* (Tenn. May 10, 2016) (agreeing with the trial court's finding that "there was no requirement of reasonable efforts by a social service agency due to the fact that this action was a private adoption"). Consequently, Mother's argument regarding the lack of evidence regarding DCS involvement is without merit.

## V. CONCLUSION

For the aforementioned reasons, the decision of the chancery court is hereby affirmed and remanded for further proceedings. Costs of this appeal are taxed to the appellant, Jennifer O. Because Jennifer O. is proceeding *in forma pauperis,* execution may issue for costs if necessary.

_____
BRANDON O. GIBSON, JUDGE